**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

OMAR LUGO, YESSICA ACEVEDO, and their conjugal
Partnership, OSCAR COLON, SARAI PEREZ MERCADO.
And their conjugal partnership,

Civ. Num. 14-

Plaintiffs

Re:   Civil Rights Violations
Preliminary Injunction
vs.                                                    Declaratory Judgment

THE PUERTO RICO ELECTRIC POWER AUTHORITY          PLAINTIFFS DEMAND
 JORGE HERNANDEZ PEREZ, ZORAIDA FUENTES            TRIAL BY JURY
 MOURE and their conjugal partnership, in his personal
And Official capacities, JUAN ALICEA FLORES, JANE
DOE and their conjugal partnership in his personal
And official capacities, VICTOR M. OPPENHEIMER
SOTO, SUSAN ROE, and their conjugal partnership, in his
personal and official capacities, MARIA M. MENDEZ RIVERA,
JOHN ROE, and their conjugal partnership, in her
personal and official capacities MANUEL PEREZ SOLER,
MARIA TERESA ADAMES AQUINO, and their
conjugal partnership, ANGEL FIGUEROA JARAMILLO,
SUSAN ROE and the conjugal partnership formed by
them, JOHN AND JANE ROE and their conjugal
partnership, INSURANCE COMPANIES A, B, and C

Defendants

_____

**COMPLAINT**

**TO THE HONORABLE COURT:**

1

COME NOW plaintiffs Omar Lugo, Yessica Acevedo, and their conjugal partnership, and Oscar Colon, Sarai Perez and their conjugal partnership, through their undersigned counsel, and respectfully ALLEGE and PRAY as follows:

I.      JURISDICTION

1.  This suit is brought and jurisdiction lies pursuant to 42 U.S.C. §§ 1983, 1988, as amended, and the First, Fifth and Fourteenth Amendments of the United States Constitution.

2.  This Honorable Court has jurisdiction over plaintiff's federal claims under 28 U.S.C. 1331 and 1343. Its jurisdiction over state law claims is invoked pursuant to the doctrine of pendent or supplemental jurisdiction. 28 U.S.C. 1367. The following local laws are invoked: the Due Process Clause of the Puerto Rico Constitution, Section 4 of the Puerto Rico Constitution, Articles 1802 and 1803 of the Puerto Rico Civil Code, and 32 L.P.R.A. § 3115, and in the case of Mr. Colon Law 44 of Puerto Rico.

3.  The proper venue for this case lies in this Court, as the defendants all reside in Puerto Rico and the causes of action took place here. 28 U.S.C. 1391(b). All of the actions of Jorge Hernandez Perez, Juan Alicea Flores, Victor Oppenheimer, Maria M. Mendez, were taken under color of law, and the remaining defendants

2

conspired with the public officials to deprive plaintiffs of their civil rights.

**Right to a Preliminary Injunction**

4.   In order for this Court to grant a preliminary injunction, plaintiffs must show

irreparable harm, the likelihood of prevailing on the merits, that the balance of the

equities weighs in their favor, and that the public interest will be served by the

issuance of the injunction. *Winter v. Nat. Res. Def. Council,* 555 U.S. 7, 20

(2008).

5.   The public officials' actions in conspiring with the remaining defendants to initiate

and maintain the baseless decisions to suspend and then dismiss plaintiffs

without grounds and in violation of their fundamental constitutional rights have

caused and are causing plaintiffs significant and irreparable harm.

6.   The harm includes emotional distress, and severe harm to the reputation of these

workers, whose only "sin" was to work at the Isabela office of PREPA, where

defendants sought to dismiss the New Progressive Party supervisors so that

defendants could replace those supervisors with people from the Popular

Democratic Party and the NPP activist Jose Marcelo Rivera, as they did by

replacing the supervisor Nydia Soto with the Popular party activist Alfonso

Villafañe.

3

7. Plaintiff Omar Lugo was placed on probation, required to provide a sworn statements against the NPP supervisor, and ordered to pay restitution due to defendants' unconstitutional conditions in violation of his First, Fifth, and Fourteenth Amendment rights and suffered and suffers irreparable harm as a result.

8. The PREPA defendants in conspiracy with the UTIER used Mr. Colon as a pawn in their scheme to secure the plum jobs of NPP supervisors for members of the Popular Democratic Party. In the process, all defendants violated Mr. Colon's Fifth and Fourteenth Amendment rights. Mr. Colon has suffered and continues to suffer irreparable harm as a result of defendants' actions.

9. It is well settled that the dismissal of career employees to replace them with political hacks violates the First Amendment. *See eg., Branti v. Finkel,* 445 U.S. 507, 518 (1980); *Martinez Velez v. Rey Hernandez,* 506 F.3d 32, 39 (1st Cir. 2007); *Jimenez Fuentes v. Gatzimbide,* 807 F.2d 236 (1st Cir. 1986).

10. PREPA, acting through Mr. Alicea Flores, Mr. Oppenheimer Soto, Mr. Hernandez Perez, and Ms. Mendez in conspiracy with UTIER leadership, dismissed plaintiffs, even though plaintiffs had not violated PREPA's rules, with untimely charges in order to be able to dismiss the NPP supervisors and Mr. Rivera and to

pressure plaintiffs to provide sworn statements against their supervisors to obtain that illegal goal.

11.  Plaintiffs are likely to prevail in this litigation. *Winter v. Nat. Res. Def. Council,* 555 U.S. at 20. Defendants violated the Fifth Amendment by suspending plaintiffs without pay based on plaintiffs' refusal to waive their right not to incriminate themselves.

12. Defendants conspired to violate the Collective Bargaining Agreement by filing the charges after the established deadline; they conspired to violate an arbitrator's decision that security guards are not competent to determine attendance, and they required plaintiffs to give forced testimony against their supervisors in exchange for reduced punishment and then had them sign invalid release agreements. *Gardner v. Broderick,* 392 U.S. 273 (1968)(unconstitutional to condition continued public employment on waiver of Fifth Amendment rights), *see also Oubre v. Entergy Operations, Inc.,* 522 U.S. 422, 429 (1998)(Employment discrimination releases must advise the party of right to consult counsel and provide at least 21 days to consider the waiver of claims).

13. The public interest favors this preliminary injunction to provide plaintiffs with the remedies requested herein, particularly given the pattern of unconstitutional

behavior by PREPA government officials and the UTIER defendants' cooperation
with that conduct.

14. This Court has even seen this particular *modus operandi* of requiring PREPA
employees to waive their Fifth Amendment rights in order to keep their jobs.
Olivencia v .PREPA, 13-1844 (PAD-MEL)

15. Miguel Cordero, PREPA's former executive director, admitted publicly that
PREPA fabricated cases against employees because of their political ideology,
and UTIIER's president, defendant Figueroa Jaramillo has confirmed that as
recently as August 8, 2014.

16. When plaintiffs' fundamental constitution rights are violated, especially
impingement of rights to free speech and free association, even the briefest of
such deprivations constitutes irreparable harm. *Vaqueria Tres Monjitas, Inc. v.
Irizarry,* 587 F.3d 464, 484 (1st Cir.2009).

## II. PARTIES

17. Plaintiff, Omar Lugo is of legal age, a United States citizen, married to Yessica
Acevedo, with whom he forms a conjugal partnership, and a resident of
Quebradillas, Puerto Rico. At all times relevant to the instant Complaint, plaintiff
was an individual protected by the laws invoked in this Complaint. Mr. Lugo is a

6

member of the New Progressive Party.

18. Plaintiff, Oscar Colon is of legal age, a United States citizen, married to Sarie Perez Mercado with whom he forms a conjugal partnership, and a resident of San Sebastian, Puerto Rico. At all times relevant to the instant Complaint, Mr. Colon was an individual protected by the laws invoked in this Complaint.

19. Defendant, the Puerto Rico Electric Power Authority is sued for injunctive relief only, not money damages.

20. Defendant Juan Alicea Flores is sued in his official and personal capacities for conspiring with the remaining co-defendants to violate plaintiffs' rights to due process under the First, Fifth and Fourteenth Amendments, plaintiffs' Fifth and First Amendments right s not be to coerced into making statements, and Mr. Lugo's First Amendment rights to belong to the political party of his conscience, all of which resulted in plaintiffs being suspended with and then without pay. In conspiracy with the other defendants, Mr. Alicea Flores also violated plaintiffs' rights under the Puerto Rico Constitution. Mr. Alicea is a member of the Popular Democratic Party.

21. Defendant Victor Oppenheimer Soto, Esq. is sued in his official and personal capacities for conspiring with co-defendants Juan Alicea Flores, Jorge

7

Hernandez Perez, Manuel Perez Soler, Maria Mendez, and Angel Figueroa Jaramillo to violate plaintiffs' rights to due process under the First, Fifth and Fourteenth Amendments, plaintiffs' First and Fifth Amendment rights not be to coerced into false statements, and Mr. Lugo's First Amendment rights to belong to the political party of his conscience, all of which resulted in plaintiffs being suspended with and then without pay. In conspiracy with the other defendants, Mr. Oppenheimer also violated plaintiffs' rights under the Puerto Rico Constitution. Mr. Oppenheimer Soto is a leader of the PREPA organization Energia Popular, a political partisan group of the PDP.

22. Defendant Maria Mendez, Esq. is sued in her official and personal capacities for conspiring with co-defendants Juan Alicea Flores, Jorge Hernandez Perez, Victor Oppenheimer Soto, Esq., Manuel Perez Soler, and Angel Figueroa Jaramillo to violate plaintiffs' rights to due process under the Fifth and Fourteenth Amendments, plaintiffs' First and Fifth Amendment rights not be to coerced into making false statements, and Mr. Lugo's First Amendment rights to belong to the political party of his conscience, all of which resulted in plaintiffs being suspended with and then without pay. In conspiracy with the other defendants, Ms. Mendez also violated plaintiffs' rights under the Puerto Rico Constitution and defamed them on the radio

8

program Noti Uno. On information and belief, John Roe is Ms. Mendez's husband, with whom she forms a conjugal partnership. Ms. Mendez is a member of the Popular Democratic Party and had been the Secretary of the PREPA Board of Directors at the same time she is Director of Human Resources of PREPA. According to an October 15, 2013 Vocero newspaper article, in the past Ms. Mendez received a complaint from Government Ethics Office when she was the PREPA Legal Consultant but OCAM office granted a retroactive waiver from 1999 until 2003. Mendez Rivera, however, violated the law in 2005 (case number 06-80) for the same thing. Ms. Mendez did not request a waiver to the State Department even though her husband had contracts with the Government Development Bank (GDB) and the Courts Administration. For this ethical violation Rivera Mendez paid a fine of $ 2,000. The newspaper's source said that Ms. Mendez Rivera is the primary liaison between Fortress and PREPA and exerts an important role in giving the nod to renewable energy projects within the corporation.

23. Defendant Jorge Hernandez Perez is sued in his official and personal capacities for conspiring with co-defendants Juan Alicea Flores, Esq., Victor Oppenheimer Soto, Esq., Manuel Perez Soler, Maria Mendez, Esq., and Angel Figueroa Jaramillo to violate plaintiffs' rights to due process under the Fifth and Fourteenth

9

Amendments, plaintiffs' First and Fifth Amendment rights not be to coerced into making statements, and Mr. Lugo's First Amendment rights to belong to the political party of his conscience, all of which resulted in plaintiffs being suspended with pay and then without pay. In conspiracy with the other defendants, Mr. Oppenheimer also violated plaintiffs' rights under the Puerto Rico Constitution. On information and belief, Zoraida Fuentes Moure is Mr. Hernandez Perez's wife, and the two of them form a conjugal partnership.

24. Defendant Manuel Perez Soler is sued for conspiring with co-defendants Alicea, Oppenheimer, Mendez, Hernandez Perez and Figueroa Jaramillo to violate plaintiffs' rights to due process under the Fifth and Fourteenth Amendments, plaintiffs' First and Fifth Amendment rights not to be coerced into making   statements, and Mr. Lugo's First Amendment rights to belong to the political party of his conscience, all of which resulted in plaintiffs being suspended without pay and then dismissed. On information and belief, Jane Doe is Mr. Perez's wife, and the two of them form a conjugal partnership. Mr. Perez Soler also violated plaintiffs' rights under the Puerto Rico Constitution. Mr. Perez was a Popular Democratic Party city council member in the prior administration of Mayor Carlos Delgado in violation of the Collective Bargaining Agreement between PREPA and UTIER.

25. Defendant Angel Figueroa Jaramillo is sued for conspiring with co-defendants Alicea, Mendez, Oppenheimer Soto, Hernandez Perez and Perez Soler to violate plaintiffs' rights to due process under the Fifth and Fourteenth Amendments, plaintiffs' First and Fifth Amendment rights not to be coerced into making statements, and Mr. Lugo's First Amendment rights to belong to the political party of his conscience, all of which resulted in plaintiffs being suspended with and then without pay. On information and belief, Susan Roe is Mr. Figueroa Jaramillo's wife, and the two of them form a conjugal partnership. Mr. Figueroa Jaramillo also violated plaintiffs' rights under the Puerto Rico Constitution.

26. Defendant Insurance Companies A, B, and C are one or more insurance companies that may have issued and have in effect policies of insurance for the risks that result from the acts stated in this Complaint, the identity of which are unknown at present.

27. Defendants John Doe, Jane Doe, John Roe and Jane Roe, and their respective conjugal partnerships, are persons responsible for the acts and damages alleged in the instant case whose identities are unknown at this moment.

II.    FACTS

**Who Plaintiffs Are**

11

28. Mr. Lugo began to work for the Puerto Rico Electric Power Authority in April 1998.

29. Mr. Colon began to work for the Puerto Rico Electric Power Authority in 2005.

30. Mr. Lugo is identified publicly at PREPA with the New Progressive Party and supports NPP candidates with campaign contributions.

31. Mr. Colon had identified with the Popular Democratic Party.

32. The vast majority of PREPA's employees belong either to the Energeticos del NPP or to Energia Popular, the Popular Democratic Party organization of PREPA employees.

33. Who belonged to each political partisan group was common knowledge at PREPA.

34. PREPA employees' time records are recorded by their sign in/sign out sheets at the job. The procedure for accrediting payroll records does not mention the controlled access system .

35.  In an arbitration decision there is a ruling on the access control system where PREPA stipulated with UTIER not use the access control system to discipline employees or dock them for time allegedly not worked

36. The records of security guards are unreliable because employees do not always

12

arrive to work in their cars; they may be dropped off by a family member, etc. and they may leave the Isabela premises in their personal vehicles, but still be involved in work activities. Furthermore, PREPA witnesses have testified that the security guards at the Isabela guardhouse lack an accurate chronometer prior to July 2013.

37. PREPA supervisors met with the private security company on July 11, 2013 to discuss the discrepancies between the information reported by the guards and the facts. As a result of that meeting, the security guard's supervisor acknowledged their errors and agreed to improve their recordkeeping in the future, and PREPA provided the guards with a clock.

39. The collective bargaining agreement between the Union de Trabajadores de la Industria Electrica y Riego (UTIER) and PREPA provides that any disciplinary action for misconduct must be brought within 30 working days of the employee's supervisor learning of the alleged misconduct.

**The Illegal Summary Suspensions**

40. On August 19, 2013, when Mr. Colon arrived at work, Laurentino Nieves Esteves, a supervisor of client service in the Isabela commercial office, and Luis Velazquez, from security, escorted about a dozen other PREPA employees to an

13

empty office on the second floor.

41. Plaintiff, Oscar Colon, who is in a wheelchair because his legs were crushed when he was run over by a car, could not go up to the second floor,

42. A co-worker, Jose M. Rivera had not wanted to leave Mr. Colon alone, but the Supervisor Laurentino Nieves told Mr. Rivera that he had to go to the second floor office with the other employees and leave Mr. Colon downstairs alone.

43. There was no written policy about how to handle the situation with Mr. Colon, and in the absence of a union delegate, Mr. Rivera had to leave Mr. Colon alone because management required him to do so.

44. Plaintiff Omar Lugo did not go to work on August 19, 2013 because his daughter had surgery on her foot that day.

45. The supervisors Jose Torres Perez and Nydia Soto Quiñones, both members of the New Progressive Party, had been fired. Defendants eventually replaced Ms. Soto with Alfonso Villafañe, a member of the Popular Democratic Party until she was restored to her position based on PREPA's violations of its procedures.

46. The vast majority of the PREPA employees on the list to be fired were known members of the New Progressive Party.

47. Plaintiffs' co-worker, Orlando Olivencia, called Manuel Perez Soler, the UTIER

14

representative to be present during these disciplinary proceedings, but Mr. Perez Soler refused to come.

48. On information and belief, Mr. Perez Soler already knew the scheme that Mr. Hernandez Perez had concocted with the other defendants to dismiss plaintiffs' NPP supervisors based on fabricated charges from subordinates fearful of losing their own jobs.

49. Mr. Luis Velazquez began calling the employees on the list one by one.

50. Mr. Velazquez called Mr. Colon to a room from the hallway where he had been waiting. Mr. Hernandez handed him a letter and told him to read the letter outside.

51. Mr. Colon collected his personal belongings and left the PREPA offices.

52. Mr. Lugo learned of the summary suspension because he spoke with Rafael Rivera, also a union member, who along with many others of the suspended workers called him. Mr. Lugo called Mayra Grajales at the Isabel office, who told him that he had to go to the Arecibo office to pick up the letter suspending.

53. Mr. Lugo went to the office of co-defendant Hernandez Perez, who gave him the letter accusing him of felonies and suspending him immediately based on alleged tardiness.

15

54. The letters to both plaintiffs stated that plaintiffs had been repeatedly late, had misused PREPA property, had falsified documents, had limited PREPA's production, had committed theft and embezzlement, and had abandoned their employment. The letters did not accuse either plaintiff of leaving work early

**Instead of Defending Their Members, the UTIER Defendants Add to the Pressure**

55. The UTIER leaders called plaintiffs and the other dismissed union members to attend a meeting at the UTIER facilities in Camuy.

56. Shortly after 1:00 p.m., plaintiffs' co-worker Olivencia texted Angel Figueroa Jaramillo and asked him to call him before a meeting set for 5:00 pm. because Ms. Nydia Soto told him that she had documents that could get the charges dismissed against everyone who was suspended that very day.

57. Ms. Soto had a copy of an e mail from July 2013 that demonstrated that management had been dissatisfied with the recordkeeping of the security guards because they noted times incorrectly and failed to note the entry and exit of certain cars. PREPA's witnesses have subsequently admitted that this is true.

58. In the e mail, Maritza Santiago confirmed the meeting that Alfonso Villafañe had with the management of the security company, admitting that the security guards

16

were to rectify the recordkeeping errors they had been committing going forward.

59. Ms. Santiago has also admitted that prior to July 11, 2013 the security guards had no accurate means to determine the time when the PREPA employees arrived or left the Isabela facilities.

60. All of the allegations against the PREPA workers who were suspended from duty on August 19, 2013 involved recordkeeping from before July 2013, those most recent being the end of May 2013.

61. In the days before August 19, 2013 PREPA supervisors from the Popular party altered records regarding union workers from the Popular party so that it would appear that they had arrived on time, when they had been late according to the guards' logbook.

62. Mr. Figueroa Jaramillo refused to even look at the evidence Ms. Soto had and said that he did not want Ms. Soto at the meeting.

63. At the meeting at the UTIER in Camuy, Mr. Figueroa Jaramillo said that he had known that the dismissals were going to occur for the last two or three weeks, and   that in all the time he had been in the union, he had never seen so many employees dismissed from one regional office at a time.

64. Mr. Figueroa Jaramillo also told the suspended workers that the union would not

be getting them lawyers for their informal hearings and that they should not hire

their own attorneys because in his experience private lawyers only ruined cases;

that no one should speak at the informal hearings; and that they should wait for

the formal hearings to present exculpatory evidence, but that the formal hearings

could take years to be scheduled.

65. In the cases of the only two union workers to request formal hearings, defendants

[the PREPA defendants had to reach an agreement with the UTIER defendants

for a hearing officer to be chosen], it took a year to begin and only began as a

result of this Court setting a hearing on the injunctive relief sought in that

Complaint.

66. Fausto Ramos Quiros, Esq., the hearing officer upon whom defendants agreed,

stated at the beginning of the formal hearing of Orlando Olivencia and Jose M.

Rivera Ramirez that he had been notified that he had to set the formal hearing

with a sudden urgency.

67. At the Camuy meeting, Mr. Olivencia said that he imagined that the UTIER

would be holding a general strike the next day to protest this mass dismissal

without cause.

68. Mr. Figueroa Jaramillo responded that the whole matter had to be settled quickly,

18

before the press learned of it because PREPA's image had suffered a great deal recently; he told them that they could be facing criminal charges because they had been accused of stealing time from PREPA, and he instructed all of those present at the meeting not to talk about what had happened with anybody, particularly the media.

69. Mr. Figueroa Jaramillo's conduct in this instance contrasted sharply with his conduct in other labor disputes with PREPA, during which he was always ready to call for a general strike. Since the August 2013 summary dismissals, the UTIER has called general strikes repeatedly in response to PREPA actions.

70 In addition to trying to silence the union members, Mr. Figueroa Jaramillo further warned them that if criminal charges were filed, UTIER could not defend them.

71. Mr. Figueroa Jaramillo said that he was going to meet with Victor Oppenheimer, Esq., the director of PREPA's legal division, and that he would have to accept whatever Mr. Oppenheimer was willing to offer. Again, Mr. Figueroa's stance in this instance varied sharply from his usual call for strong stands in favor of workers' rights and it was designed to intimidate the suspended workers.

72. Mr. Figueroa Jaramillo also told all the union members at the meeting that for less serious accusations than the charges against them, "El Buho" Marrero had

19

gone to prison. [Senator Marrero was convicted of misappropriating $600.00)

73. Someone at the meeting asked Mr. Figueroa Jaramillo what would happen with their medical insurance, and he said he did not know, that he would try to keep their insurance in place until their formal hearings, but that he could not guarantee that, even though the practice was for union members to keep their PREPA medical plan which a hearing was pending.

74. Mr. Figueroa Jaramillo also told all the union members that if they had any money in their pension plans, that they should take it out quickly because if they left it in, it would be more difficult to withdraw later.

75. Mr. Rivera, the PREPA employee who had tried to stay with Mr. Colon, told Mr. Figueroa Jaramillo that the suspension was obviously political because Mr. Hernandez had not suspended Popular employees who had also left the parking area before the end of the workday according to the guard's logbook since they performed the same jobs at the same time as employees who had been dismissed.

76. When Mr. Rivera said this, Mr. Figueroa Jaramillo got angry and said that everyone knew that he [Mr. Figueroa]   was a member of the pro Independence party, and that he   was not going to talk about politics.

20

77. Even though Mr. Figueroa Jaramillo knew or should have known that the suspensions were invalid because they were untimely and violated the Collective Bargain Agreement and the existing arbitrator's decision, he mocked Mr. Rivera for saying the suspensions were politically motivated, he said angrily to Mr. Rivera that he could not add more people to the bucket because it was too heavy already and if he kept adding weight he was not going to be able to lift it. [Meaning that the union should not be concerned about the dismissals without just cause of plaintiffs' NPP supervisors, even if one .]

78. Mr. Figueroa Jaramillo repeated that he had a meeting scheduled with Mr. Oppenheimer the next day at 7:30 am, and that he was going to accept whatever offer Mr. Oppenheimer made.

79. On August 20, 2013 at around 2:30 p.m., plaintiffs learned that PREPA had reinstated their co-worker Mairis Gomez because they said payroll had overlooked certain things, so they closed her case. Ms. Gomez was suspended with the other NPP workers on August 19, but PREPA has never revoked her suspension in writing.

80. At around 4:30p.m. on August 20, 2013, plaintiffs received a text message stating that there would be a meeting at 6:30 that evening in the UTIER offices in

Camuy.

81. Mr. Rivera, with whom Mr. Colon was going to get a ride, did not go to the meeting, so Mr. Colon had to arrive late. Mr. Perez Soler began the meeting by telling everyone present that the only person whose case was not being settled was Mr. Rivera, because Mr. Oppenheimer did not want to settle with Mr. Rivera because of the "gravity" of his misconduct and that the others should not miss the chance to settle.

82. Mr. Perez Soler then told the suspended workers that he had seen the evidence against them, and it was bad, even though the only evidence that PREPA had was an audit of discrepancies from unreliable guards' records and the payroll records of the suspended workers.

83. In the particular case of Mr. Colon, the discrepancies for late arrivals, the only thing for which he was suspended, amounted to 245 minutes, far less than the 400 minute cutoff to which Mr. Hernandez testified, and also less than the 500 minute cutoff PREPA has indicated existed in pleadings filed before this Court.

84. Mr. Perez Soler then told each of the suspended workers what each had to provide a sworn statement to procure the dismissals of their NPP supervisors, saying that this is what he had negotiated with Mr. Oppenheimer as a condition

22

of their returning to work.

85. Mr. Perez Soler told the janitor, Jorge Lasalle, that he would have to swear that he left before 5:00 p.m., bought cleaning supplies with his own money, and through an agreement with management, was compensated with time off.

86. Mr. Perez Soler told the union members that they had had to slap the security guard to make him to talk about the discrepancies,   and then when he started the PREPA defendants had hit him twenty times to make him shut up about the discrepancies.

87. Mr. Perez Soler told Juan A Morales, Carlos Lugo, and Rafael Velez that they had to say that they had an agreement with management to use an official PREPA vehicle as a means of transportation to travel back and forth from Quebradillas to Isabela.

88. Mr. Perez Soler told Mr. Olivencia that Victor Oppenheimer said that he had to accept 40 hours of suspension and that he did not have to give   testimony against anyone.

89. Mr. Olivencia refused, saying that the guards' annotations of attendance were inaccurate, that he had evidence to demonstrate that he had not been tardy on the days in question, and that PREPA had already admitted that it had made

mistakes in the cases of other employees. Mr. Perez Soler answered that Mr. Olivencia would have to prove that he had committed zero offenses, inverting the burden of proof and contradicting the supposed policy of a cutoff number of discrepancies.

90. Moreover, Mr. Perez Soler had told Jerry Soto that if he showed one date of late arrivals was incorrect, then the entire case against him would fall.

91. Mr. Olivencia then asked Mr. Perez Soler what would happen if he accepted the agreement, including the 40 hours of suspension, and then the next day the security guard put down his arrival time at 8:40 a.m., when he had arrived at 8:30 a.m.

92. Mr. Perez Soler told Mr. Olivencia that if that happened, he and the manager would be fired again.

93. Mr. Perez Soler discussed the conditions to be placed on all the employees in order for them to return to work, as Mr. Perez Soler consulted on the phone with Mr. Oppenheimer.

94. Mr. Perez Soler told Mr. Lugo that he, Alexander Soto, and Rafael Rivera would all receive a suspension of 40 hours and that they would have repay the money "stolen."

24

95. The meeting ended at around 8:15 p.m.

96. Mr. Perez Soler took Mr. Colon aside and told him that PREPA would take him back because of his "situation," and that he should assert his Fifth Amendment rights the next day.

97. Then Mr. Perez Soler told Mr. Lugo and the other suspended PREPA workers to wait because there cases were being negotiated at the Governor's mansion.

**Dismissals with the Due Process of an Informal Hearing and in Violation of the Fifth Amendment.**

98. On August 21, 2014, the suspended employees were called to individual meetings about the charges against them, and Mr. Perez Soler came up to the each of the union members and told them that no one was going to testify at the meetings because it went badly for union members who testified.

99. When it came time for Mr. Lugo's hearing, he answered the basic questions as to his name and address, but when the questions about his alleged misconduct came, Mr. Perez Soler wrote on his notebook that Mr. Lugo should state that he invoked his right not to testify.

100. PREPA tape recorded the meetings, but now denies that the recordings exist.

101. PREPA warned Mr. Lugo that if he testified, his answers could be used against

him in a Court of law. In the summary suspension letters, the PREPA defendants had accused both Mr. Lugo and Mr. Colon of committing felonies.

102. Mr. Colon also answered only the questions as to his name and address, but took the Fifth Amendment when Mr. Hernandez Perez asked him about the alleged misconduct in accord with UTIER's instructions.

103. PREPA warned Mr. Colon that if he testified, his answers could be used against him in a Court of law. In the summary suspension, defendants had accused both Mr. Lugo and Mr. Colon of committing felonies.

104. The PREPA Defendants did not offer either Mr. Lugo or Mr. Colon immunity from criminal prosecution. The UTIER defendants did not request immunity for either of them.

105. Based on Mr. Colon's failure to put on evidence in his defense, and the security guards' invalid and untimely statements as to his attendance, PREPA suspended him without pay in violation of the First, Fifth, and Fourteenth Amendments and tried to take away the cards of his family medical insurance, but Mr. Colon did not have the cards with him. Mr. Perez Soler told Mr. Hernandez that he would go to Mr. Colon's house to take the cards away from him.

106. Based on Mr. Lugo's failure to put on evidence in his defense, and the security

guards' invalid and untimely statements as to his attendance, PREPA suspended him without pay in violation of the First, Fifth, and Fourteenth Amendments and removed the cards of his family medical insurance.

**UTIER's Insistence at PREPA's Behest on the Sworn Statements as a Quid Pro Quo for Reinstatement**

107. After the investigative meetings ended, Mr. Perez Soler told all the suspended employees to go directly to the UTIER headquarters in Camuy.

108. The employees had been waiting without eating, and Mr. Perez Soler said he would order pizzas.

109. While they waited for the pizza, Mr. Perez Soler told them that the terms of the agreement with PREPA had changed. The suspended union members would have to testify against management, accept the misconduct alleged, some had to return the money "stolen" [by having been tardy], and some had to accept probation for a year.

110. Mr. Olivencia asked why the day before he had been offered by Mr. Oppenheimer the chance to return to work in exchange for a 40 hour suspension, and Mr. Perez Soler answered that Maria Mendez, Esq. had changed all the agreements because PREPA Executive Director Juan Alicea Flores had not yet

approved the agreements when Mr. Perez Soler told them of the original

proposals.

111. Mr. Perez Soler told them that Attorney Mendez required all the suspended

employees to testify against management and if they wanted to go back to work,

they had to accept what she says. Defendant Mendez is a member of the

Popular Democratic Party

112. Mr. Olivencia responded that he did not have many financial obligations, so he

did not have accept Attorney Mendez's terms, and Mr. Perez told him that's your

decision, but remember that even if you win, you will probably be out of work for

five years.

113. Mr. Olivencia said he did not care, and Mr. Perez Soler got angry.

114. Mr. Perez then told Mr. Lasalle that he would not be suspended, but that he

would have to testify against Nydia Soto. Mr. Lasalle answered that he preferred

a suspension of 500 hours and not to testify against Ms. Soto. Mr. Perez replied

that if Mr. Lasalle wanted to return to work, he had to testify against Ms. Soto.

115. Mr. Lasalle began saying that his dignity was all that mattered, and that he did

not agree with the proposal. Mr. Olivencia said that he had evidence that would

exonerate everyone, that no one should sign, and left the room. Mr. Perez Soler

28

then told everyone else not to pay any attention to Mr. Olivencia because Mr.

Olivencia was crazy, that he thought that he could save the workers with one

piece of paper, that he could rebut one or two of the dates, but not all of them. Of

course, Mr. Olivencia had Ms. Soto's e mail which would have exonerated

everyone because it had the guard company's admission in July 2013, after all

the alleged offenses had occurred, demonstrating that the guards' entries as to

arrival and departure time were untrustworthy.

116. Mr. Perez took Mr. Lasalle and then Mr. Morales and Mr. Carlos Lugo to the

room, and then they came out, the last two saying that each person had to save

himself. [La salvacion es individual.] , and Mr. Lasalle as calm as a lamb after he

had been so angry about his dignity just minutes before.

117. Another of the suspended workers, William Quiñones, said that Jorge

Hernandez Perez himself had authorized him to work Sunday with a side

agreement, and now Mr. Hernandez Perez wanted to fire the NPP supervisors

for having side agreements. Defendant Hernandez Perez is a member of the

Popular Democratic Party.

118. The suspended worker Angel Alicea mentioned that he worked Saturdays in

Quebradillas, and Regional Administrator's assistant authorized them to work

29

through lunch to leave early. The Regional Administrator is Alfonso Villafañe, who is also a member of the Popular Democratic Party.

119. The testimony that defendants sought to implicate supervisors only involved NPP supervisors.

120. Meanwhile, Mr. Perez was talking with some of the suspended workers one by one in another office. As each worker left the office, he had stopped complaining and agreed to testify against management.

121. The suspended workers were anxious, hungry, suffering, fatigued mentally, with their spouses calling, unduly pressured by Mr. Perez's tactics, which were particularly ironic for a union official to tout each man for himself.

122. Mr. Perez Soler told Mr. Colon that he had to sign a statement implicating Nydia Soto supervisor in order to return to work.

123. Mr. Perez said that they were waiting for call from Mr. Oppenheimer, who called at about 8:00 pm.

124. Mr. Perez wrote on a yellow pad as Mr. Oppenheimer dictated, "They can be referred to the government ethics office; to Justice, to the Comptroller." The suspended workers all looked scared at what they were hearing.

125. Even though Mr. Perez knew that the workers should have been allowed to

30

keep their medical insurance, he told them they would lose it in order to pressure them to agree.

126. Mr. Perez told Mr. Oppenheimer that he was going to discuss the agreement with everyone and that he would call back briefly.

127. Mr. Perez then said to the group, "Boys, that's all there is. Do you agree? Will you testify?" Some of the group said yes, but there was no vote.

128. Mr. Perez called Mr. Oppenheimer and told him that everyone was going to plead guilty and testify.

129. Defendants offered no deal to Mr. Rivera. Mr. Rivera stood up and congratulated his colleagues on returning to work, saying that the process was corrupt and had been selective, completely discriminatory against him for ideological reasons, and that even if he had to eat dirt for the next few years, the true would prevail.

130. Mr. Perez then told the other suspended workers that they should go to the Arecibo regional office the next day, and as soon as they signed the statements against the NPP supervisors, they would get their medical insurance cards back and return to work.

131. On August 22, 2013, the PREPA defendants had plaintiffs sign settlement

agreements, stating that they would not sue PREPA. The settlement agreements

violate federal law in that they do not advise plaintiffs that they should consult

with an attorney before signing the agreement, they did not provide plaintiffs with

at least 21 days to consider the agreements, they did not provide plaintiffs with at

least 7 days to rescind the agreements, and they were not approved by anyone

from the office of the Puerto Rico Department of Labor.

132. The Collective Bargaining Agreement between UTIER and PREPA provides

that the first time a PREPA employee is accused of repeated tardiness she may

receive a formal warning. The sanction for the second and third time an

employee is found to have been tardy repeatedly is also a formal warning.

133. Being absent from work without prior permission also warrants a formal warning

for a first offense; a second offense warrants a 40 hour suspension.

134.On September 10, 2013, Mr. Oppenheimer visited the PREPA office in Isabela

and told the union workers who had signed the sworn statements and settlement

agreements that they had to repeat the testimony in the injunction hearing due to

be held two days later.

135. Mr. Oppenheimer told Mr. Lugo that he, Oppenheimer, knew that the workers at

the Isabela office had not stolen time from PREPA. Defendant Oppenheimer also

32

told Mr. Lugo not to worry, that he would not have to testify because the injunction hearing would be cancelled and the case referred to the administrative proceedings. Edna Rios, Esq., another PREPA attorney, told Mr. Oppenheimer that he should shut up and not talk too much.

136. Immediately before the injunction hearing scheduled for the supervisors in local Court in September 2013, defendant Oppenheimer pointed to Mr. Colon and said that PREPA was even willing to throw a guy in a wheelchair out of the street, look how bad it's going to be for the rest of you.

137. On September 10, 2013, Mr. Hernandez Perez stated that he did not care if the NPP supervisors, Mr. Olivencia, and Mr. Rivera sued him for political discrimination because he had no money with which to pay a judgment. Mr. Oppenheimer responded that no one was going to be able to sue for political discrimination because he had put some Popular Party members in the group of suspended worker to refute any such allegations. The Popular Party members ultimately received much less or no punishment. Mr. Hernandez even testified that he had actually investigated the case of Heriberto Cardona, a Popular Democratic Party member, and exonerated him based on that meeting. No NPP member was afforded the opportunity to rebut the charges without the threat of

33

criminal charges.

138. The Superior Court of Arecibo dismissed the request for a preliminary injunction because on September 10, 2013 PREPA designated a hearing officer to hear the supervisors' case.

## FIRST CLAIM FOR RELIEF
## 42 U.S.C. § 1983
## (VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS)

139. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

140. Because Defendants failed to afford Mr. Lugo and Mr. Colon due process of law by affording them an informal hearing prior their summary suspension, they violated 42 U.S.C. 1983 with knowing and reckless disregard of said Act's proscriptions.

141. Because Mr. Perez Soler and Mr. Figueroa Jaramillo, in conspiracy with the other defendants refused to consider the exculpatory evidence of either Mr. Lugo or Mr. Colon before the illegal suspension, they conspired to and in fact denied Mr. Colon and Mr. Lugo due process.

34

142. Defendants summarily suspended Mr. Lugo and Mr. Colon without due process.

143. Defendants engaged in policies and practices which willfully, or in the alternative unwillfully, discriminated against the plaintiffs by not affording them due process of law.

144. Mr. Lugo and Mr. Colon have a property interest in their continued employment of which they cannot be deprived without due process.

145. As a result of the before mentioned, Mr. Lugo and Mr. Colon is each entitled to be paid by defendants the following damages: punitive, emotional, and economic damages of not less than the sum of $500,000.00, plus interest and any other benefits allowed by law.

146. All of the previously mentioned acts of the defendants violated 42 U.S.C. 1983, and the other federal laws previously cited.

147.   Mr. Lugo and Mr. Colon seek an apology for the false accusations and Mr. Lugo asks this Court to order PREPA to eliminate his probation, restore his salary for the time he was suspended, and order that PREPA is precluded from charging Mr. Lugo for any supposed "stolen" time.

## SECOND CLAIM FOR RELIEF

## PUERTO RICO CONSTITUTIONAL DUE PROCESS PUERTO RICO ARTICLE II, SECTION 7

148. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force
35

and effect as if herein set forth.

149. Defendants by the acts previously described in this Complaint, violated the Constitution of Puerto Rico which prohibits the deprivation of property without due process of law. Mr. Colon and Mr. Lugo seek an apology, and Mr. Lugo seeks payment of the 40 hours he was suspended without due process, an elimination of his probation, and an elimination of any pretense by PREPA of charging him for "stolen" time.

150. Defendants' discrimination has harmed plaintiffs emotionally and economically. The amount of damages exceeds $500,000.00 each.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### (VIOLATION OF THE FIRST AMENDMENT)

151. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

152. Defendants by the acts previous described in this Complaint, violated plaintiffs' rights under the First Amendment by forcing them to provide testimony.

153. Defendants also violated the rights of Mr. Lugo to associate with whomever he desires based on their political affiliation and to assert his support for statehood without fear of losing his jobs as has happened here.

154. Defendants' discrimination has harmed plaintiffs economically and emotionally,

36

and plaintiffs are entitled to punitive damages for defendants' conspiracy to violate the United States Constitution. The amount of damages exceeds $1,000,000.00.

## FOURTH CLAIM FOR RELIEF
## PUERTO RICO CONSTITUTION ARTICLE II, SECTION 8
## PROTECTION AGAINST ATTACKS TO A PERSON'S HONOR, REPUTATION, AND FAMILY LIFE

155. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

156. Defendants by the acts previously described in this Complaint, violated the Constitution of Puerto Rico, Article II, Section 8, which requires that all persons have a right to legal protection against abusive attacks against their honor, reputation and family life.

157. Defendants' aggressive attack on plaintiffs' honor, reputation and family life has harmed each plaintiff economically and emotionally. The amount of damages exceeds $500,000.00.

158.    Plaintiffs also seek an apology.

## FIFTH CLAIM FOR RELIEF
## VIOLATION OF SECTION 1983 OF THE U.S. CODE
## THE FIFTH AMENDMENT

159. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force

37

and effect as if herein set forth.

160.   By conditioning their continued employment on a waiver of their Fifth Amendment rights not to incriminate themselves, defendants violated plaintiffs' Fifth Amendment rights.

161.   The amount of damages exceeds $1,000,000.00.

## SIXTH CLAIM FOR RELIEF
## VIOLATION OF ARTICLE II, SECTION II OF THE PUERTO RICO CONSTITUTION

162. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

163.   By conditioning their continued employment on a waiver of their Fifth Amendment rights not to incriminate themselves, defendants violated plaintiffs' Fifth Amendment rights.

164.   The amount of damages exceeds $1,000,000.00.

## SEVENTH CLAIM
## ARTICLES 1802, 1803 PUERTO RICO CIVIL CODE
### (Mental and Moral Damages)

165. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

38

166. As a result of the before mentioned acts and omissions, the defendants have directly and intentionally inflicted emotional distress, humiliation, harassment, and mental anguish on the plaintiffs, in an amount in excess of $500,000.00. Ms. Mendez intentionally defamed plaintiffs by saying they had stolen time from PREPA, with the knowledge that her statements were false and with the intention of harming plaintiffs. The plaintiffs haves suffered immensely because of the illegal activities of defendants and are desperate, depressed, and anxious. They have spent endless nights and days of worry, uncertainty and despair. Their severe mental depression and emotional distress has caused severe problems in their lives.

## EIGHTH CLAIM FOR RELIEF
## PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

167. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

168. Plaintiffs are suffering irreparable harm each day the false accusations remain in their records and the possibility of criminal accusations. Mr. Lugo is still on probation and faces the illegal confiscation of funds to repay time PREPA claims he stole due to defendants' unconstitutional actions.

169. The likelihood of success on the merits in this case is high because defendants lack any evidence that plaintiffs violated any of PREPA's rules, much less a rule which

39

would cause harm to the Treasury of Puerto Rico or imminent harm to any person.

170. The balance of the equities favors plaintiffs because defendants have no evidence that they violated any rule because they did not do so and instead worked efficiently and effectively for PREPA

171. The public interest would be served by granting a preliminary injunction expunging the illegal accusations from the files of both plaintiffs, ending the threat of crimination accusations, and ending Mr. Lugo's probation.

172.   This Court should also order all defendants to issue a public apology for the disciplinary actions and Ms. Mendez's defamation.

**TRIAL BY JURY**

173. Plaintiffs demand trial by jury.

WHEREFORE, in view of the foregoing, plaintiffs respectfully request that judgment be entered against the defendants jointly and severally, as follows:

a) Ordering PREPA to expunge plaintiffs' records of the false accusations immediately, and prohibit criminal accusations from being filed, end Mr. Lugo's probation and the threat of restitution, and the PREPA defendants to repay Mr. Lugo for the 40 hours he was suspended and all   defendants to pay plaintiffs a sum in excess of $500,000.00 plus interest as per the First Claim for Relief (Section 1983, deprivation of property

40

without due process of law);

b) Ordering PREPA to expunge plaintiffs' records of the false accusations immediately, and prohibit criminal accusations from being filed, end Mr. Lugo's probation and the threat of restitution, and the PREPA defendants to repay Mr. Lugo for the 40 hours he was suspended and all   defendants to pay plaintiffs a sum in excess of $500,000.00 plus interest as per the Second Claim for Relief (Due Process Pursuant to the Puerto Rico Constitution);

c) Ordering PREPA to expunge plaintiffs' records of the false accusations immediately, and prohibit criminal accusations from being filed, end Mr. Lugo's probation and the threat of restitution, and the PREPA defendants to repay Mr. Lugo for the 40 hours he was suspended and pay all plaintiffs a sum in excess of $1,000,000.00 as per the Third Claim for Relief (Violation of the First Amendment);

d) Ordering PREPA to expunge plaintiffs' records of the false accusations immediately, and prohibit criminal accusations from being filed, end Mr. Lugo's probation and the threat of restitution, and the PREPA defendants to repay Mr. Lugo for the 40 hours he was suspended and all   defendants to pay plaintiffs a sum in excess of $500,000.00 plus interest as per the as per the Fourth Claim for Relief (Attacks on honor, family, and reputation)

41

e) Ordering PREPA to expunge plaintiffs' records of the false accusations immediately, and prohibit criminal accusations from being filed, end Mr. Lugo's probation and the threat of restitution, and the PREPA defendants to repay Mr. Lugo for the 40 hours he was suspended and all   defendants to pay plaintiffs a sum in excess of $1,000,000.00 plus interest as per the as per the Fifth Claim for Relief (Violation of the Fifth Amendment)

e) Ordering PREPA to expunge plaintiffs' records of the false accusations immediately, and prohibit criminal accusations from being filed, end Mr. Lugo's probation and the threat of restitution, and the PREPA defendants to repay Mr. Lugo for the 40 hours he was suspended and all   defendants to pay plaintiffs a sum in excess of $1,000,000.00 plus interest as per the as per the Sixth Claim for Relief (Violation of Article II, Section II of the Puerto Rico Constitution)

f) Ordering defendants to pay plaintiffs the sum of $500,000 as per the Fifth Claim for Relief (Articles 1802, 1803 of the Puerto Rico Civil Code)

g) Ordering defendants to expunge each plaintiff's record of the false accusations, end Mr. Lugo's probation, the threat of criminal prosecution of both plaintiffs, and the threat of restitution to Mr. Lugo as per the Eighth Cause of Action.

h) Ordering defendants to cease and desist from any further discriminatory conduct;

42

i) Ordering the defendants in the respective causes of action to pay interest,

costs, and attorney's fees, pursuant to 42 USCA §2002-5(k); and,

j)      Granting such other and further relief as may be just and proper.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico this 11th day of August 2014.

LAW OFFICES OF
JANE BECKER WHITAKER
 /s/Jane Becker Whitaker
P.O. Box 9023914
San Juan, PR 00902-3914
Tel. (787) 754-9191
Fax (787) 764-3101
JANE BECKER WHITAKER
USDCPR Bar Number 205110

43